United States District Court
Southern District of Texas
**ENTERED**
November 23, 2015
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARIE A. HICKS-FIELD, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-3650 |
| | § | |
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant Harris County, Texas'
("Harris County") Amended Motion to Dismiss, for Judgment on the
Pleadings, and for Summary Judgment (Doc. 109),[2] Harris County's
Objections to and Motion to Strike Exhibit PP to Plaintiffs'
Response to Harris County's Amended Motion to Dismiss, for Judgment
on the Pleadings, and for Summary Judgment (Doc. 137), and Harris
County's Motion to Strike Plaintiffs' Supplemental Brief in
Opposition to Harris County's Assertion that it is Entitled to
Governmental Immunity (Doc. 159).  The court has considered the
motions, the responses, all other relevant filings, and the
applicable law.  For the reasons set forth below, Harris County's
nondispositive motions are **DENIED**, and the court **RECOMMENDS** that
Harris County's dispositive motion be **GRANTED**.

---

[1]     This case was referred to the undersigned magistrate judge pursuant
to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the
Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 6.

[2]     Document 111, Sealed Event, is also listed as a pending motion on the
electronic filing system.  However, that entry is a copy of the motion that was
filed as Document 109 along with the attachment of sealed exhibits.

## I.  Case Background

This action arose out of a use-of-force incident in the Harris County Jail.[3]  Plaintiffs, as heirs of deceased inmate Norman Ford Hicks ("Hicks"), filed this action in state court against the county, a named detention officer, and other unnamed county deputies.[4]  The case was removed to this court on December 17, 2012.[5]

## A.  Use-of-Force Incident

In March 2009, Hicks pled guilty to a charge of aggravated assault on a family member.[6]  The court deferred adjudication of guilt and placed Hicks on community supervision ("probation") for a period of five years.[7]

In October 2010, Hicks was in Oklahoma.[8]  An Oklahoma University patrol officer encountered Hicks in the early morning hours of October 16, 2010, while Hicks was walking along a roadway in Oklahoma City.[9]  The officer offered to transport Hicks to a

---

[3]     See Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 1, Pls.' Original Pet.

[4]     See id.

[5]     See Doc. 1, Notice of Removal.

[6]     See Doc. 142-5, Ex. 56 to Harris Cty.'s Am. Reply to Pls.' Resp. to Harris Cty.'s Am. Mot., Order of Deferred Adjudication.

[7]     See id.

[8]     See Doc. 109-6, Ex. 6 to Harris Cty.'s Am. Mot. to Dismiss, for J. on the Pleadings, & for Summ. J. ("Harris Cty.'s Am. Mot."), Incident/Offense Report.

[9]     See id.

shelter for the night, and, while in route, was notified by dispatch that a Harris County warrant existed for Hicks' arrest for aggravated assault on a family member.[10]  On November 4, 2010, upon confirming that information, the officer placed Hicks under arrest and transported him to the Oklahoma County Detention Center where Hicks was held pending an extradition hearing.[11]

Hicks was extradited, and, on January 7, 2011, Hicks was booked into the Harris County Jail.[12]  The usual intake process involved the screening and/or evaluation of the detainee prior to classification for housing in one of three jail facilities.[13]

During Hicks' intake process, Hicks reported to the screening nurse that he had a history of schizophrenia.[14]  The nurse also recorded an elevated blood pressure reading and referred Hicks for

---

[10]     See Doc. 109-6, Ex. 6 to Harris Cty.'s Am. Mot., Incident/Offense Report.

[11]     See id.

[12]     See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Michael M. Seale, M.D., ("Dr. Seale") p. 9.  Dr. Seale, whom Harris County identified as a non-retained expert, is the Executive Director for Health Services for the Harris County Sheriff's Office ("HCSO").  See id. ¶ 2; Doc. 64, Harris Cty.'s Designation of Experts pp. 2-3.  His affidavit includes his knowledge of relevant facts as well as expert opinion.  See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale.  Both parties submitted Dr. Seale's affidavit into evidence.  See Doc. 109-7, Ex. 13 to Harris Cty.'s Am. Mot. Aff. of Dr. Seale; Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale.  In the court's account of the facts, the court relies on Dr. Seale's affidavit for factual information and for Dr. Seale's explanation of entries in Hicks' jail records.

[13]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Christopher Taylor ("Taylor") p. 13; Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 9.

[14]     See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 9; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

further medical and psychiatric evaluation.[15]  Within a few hours, a nurse and medical physician in the jail clinic had evaluated Hicks.[16]  The evaluating nurse confirmed the elevated blood pressure reading and noted also that Hicks was complaining of neck pain and was unable to list his prescribed medications.[17]  The medical physician gave Hicks over-the-counter medication for neck pain, prescribed antihypertensive medication, and referred Hicks to the Chronic Care Clinic for followup.[18]

In the early afternoon hours of January 8, 2011, a psychiatrist assessed Hicks.[19]  Hicks denied experiencing hallucinations, paranoid delusions, suicidal ideation, or homicidal ideation.[20]  The psychiatrist noted no mania, no psychosis, and no

---

[15]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 9; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[16]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale pp. 9-10; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[17]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 9; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[18]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[19]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[20]   See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 1; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

depressed mood.[21]  Hicks reported a history of "staying up for 6 days [and] having excessive energy."[22]  Hicks appeared unkempt, euthymic, goal directed, and oriented times three with clear thinking.[23]  The evaluator described Hicks as talking constantly and as difficult to understand due to missing teeth.[24]

The note acknowledged a previous psychiatric hospitalization and diagnosis of schizoaffective disorder (a combination of symptoms of schizophrenia and symptoms of affective disorder).[25]  Hicks refused the psychiatrist's recommendation of medication, and the psychiatrist noted that Hicks could not "be forced as he is currently not a danger to himself or others."[26]  The psychiatrist

---

[21]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 1; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[22]    Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 1; see also Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[23]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 2; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[24]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 2; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[25]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 3; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[26]    Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 2; Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 10; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

did not recommend mental-health housing and, instead, placed Hicks in general-population housing.[27]

Two days later, Detention Officer ("Officer") Bartley Hayden ("Hayden") requested a psychiatric screening of Hicks after the officer observed Hicks arguing with other inmates.[28] He described Hicks' demeanor as "very confused" and stated that Hicks was "threatening or hostile," "shouting or screaming," and that he was exhibiting "strange or unusual behavior."[29]  Officer Hayden also indicated that other inmates had reported problems with Hicks.[30] A mental-health professional triaged the request and assigned it a routine priority level.[31]

Another officer completed a psychiatric referral on the same day because Hicks was throwing water bottles at cells and arguing with other inmates.[32]  The referral form indicated that Hicks was

---

[27]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale pp. 10-11; Doc. 124-3, Sealed App. R to Pls.' Opp'n to Harris Cty.'s Am. Mot., Initial Psychiatric Assessment p. 2; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[28]    See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 11; id. Ex. 3, Tracker.

[29]    Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 11 (quoting the referral form, which could not be located in the record).

[30]    Id.

[31]    See id. p. 11 & Ex. 3, Tracker Log; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[32]    See id.

6

"threatening or hostile" and "shouting or screaming."[33]   This referral was also assigned a routine priority level.[34]

On January 16, 2011, Officer Aaron Tartamella ("Tartamella") was working in the 2H2 cellblock on the second floor of HCSO's 1200 Baker Street Jail.[35]   About 3:40 p.m., Officer Tartamella observed Hicks "threaten and swing his towel at several inmates" and strike one inmate in the face and neck area with the towel.[36]   Neither Hicks nor the inmate he struck suffered injury.[37]   In order to have the opportunity to complete all reports and notifications regarding the incident, Officer Tartamella decided to separate the two.[38]

Officer Tartamella paged all available staff members on the second floor to assist him with the inmate disturbance.[39]   Deputy

---

[33]     Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 11.

[34]     See Doc. 124-1, Sealed App. D to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Dr. Seale p. 11 & Ex. 3, Tracker Log; Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[35]     See Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 21.

[36]     Id.

[37]     See id.

[38]     See id. ¶ 22.

[39]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Joseph Jameson ("Jameson") p. 140; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 16; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 22; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Christopher Pool ("Pool") p. 9; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 150; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

Joseph Jameson ("Jameson"), Officer Christopher Pool ("Pool"), and Officer Christopher Taylor ("Taylor") were the assigned "rovers" for that shift, and all responded to the call.[40]  Of the three rovers, Deputy Jameson was the superior officer.[41]   Officer Tartamella briefed the other officers on Hicks' behavior and requested that Hicks be escorted to a temporary holding cell.[42] Officer Tartamella told the other officers that Hicks had mental issues, that he was being written up for assault, and that he was being referred for a psychiatric evaluation.[43]  Officer Tartamella then notified Sergeant Steven Wichkoski ("Wichkoski") about the inmate assault and the decision to separate Hicks.[44]

Deputy Jameson gave Hicks instructions to walk with the officers, and Hicks complied with Deputy Jameson's instructions

---

[40]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 140; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 16, 53-54; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 9; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl. ; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 22.

[41]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 371.

[42]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 141; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[43]     See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 141; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 49.

[44]     See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 13.

without incident.[45]   The officers escorted Hicks to an attorney booth, which was commonly used as a temporary holding cell, to wait until the disturbance report was completed and the classification division of the HCSO evaluated Hicks' placement.[46]   Sergeant Wichkoski was present during the escort of Hicks to Attorney Booth #3 and observed no aggressive or assertive behavior on Hicks' part.[47]   Soon after, Sergeant Wichkoski left the floor to perform other duties.[48]

When an inmate was separated to a temporary holding cell, a Separation Cell Record Sheet ("round sheet") was used to document the condition of the isolated inmate.[49]   Rovers were responsible for

---

[45]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 151-52; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 22.

[46]    See See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶¶ 14-15; Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 180; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 16, 17, 18-19; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool pp. 9-10, 13-14; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 23.   Officer Taylor stated that the HCSO commonly used attorney booths for this purpose.   Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 18.

[47]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 16.

[48]    See id. ¶¶ 20-22.

[49]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 34; Doc. 111-10, Sealed Ex. 18 to Harris Cty.'s Am. Mot., Post Order Floor Rover p. 1.

posting the round sheet and for documenting checks of the inmate's condition at thirty-minute intervals.[50]   A round sheet was not placed on the door of the Attorney Booth #3 while Hicks was held there, and no documentation was made to indicate that Hicks' condition was checked at any time during the more than two hours during which he was confined in Attorney Booth #3.[51]

At approximately 6:00 p.m., Deputy Jameson and Officer Pool each detected the scent of feces emanating from Attorney Booth #3 and investigated.[52]   Observing that Hicks had urinated and defecated on the floor, they decided to relocate Hicks to the neighboring attorney booth to allow for cleanup.[53]   Officer Taylor returned to the area after the other two officers had opened the door of Attorney Booth #3 and asked Hicks to step out.[54]   After observing feces and urine on the floor of the booth, Officer Taylor called an inmate floor worker to clean Attorney Booth #3.[55]   Meanwhile, Deputy

---

[50]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 34.

[51]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 36; Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 129, 190-91; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 10.

[52]   See Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[53]   See id.

[54]   See id.

[55]   See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex.

Jameson and Officer Pool moved Hicks from Attorney Booth #3 to Attorney Booth #2, a distance of only a few feet.[56]  Deputy Jameson opened the door of Attorney Booth #2, and Hicks complied with Deputy Jameson's instructions to enter the room.[57]   Officer Taylor held open the door to Attorney Booth #3 while the inmate floor worker began to clean.[58]

Deputy Jameson closed the door behind Hicks.[59]  Hicks picked up a plastic chair in Attorney Booth #2 and raised it above his head.[60]  Deputy Jameson opened the door and, standing behind the door, asked Hicks to push out the chair and his shoes.[61]  Hicks did

2, Det. Command - Inmate Offense Rep. Suppl.

[56]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 206, 208.

[57]    See id.; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 144.

[58]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[59]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 208; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[60]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 232-33; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[61]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 242, 255; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 138; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

so but also threw out his shirt, which was soiled with feces.[62]  The shirt hit Officer Pool, who was standing in the doorway, in the area of his chest and arm.[63]  According to Deputy Jameson and Officer Pool, Officer Pool stepped into Attorney Booth #2 to place Hicks' shirt inside.[64]  According to Officer Taylor, Officer Pool caught the shirt, cursed Hicks, and threw the shirt back at him.[65]  Officer Taylor observed Hicks, a seventy-two year old, dodge the shirt and swing at Officer Pool, a twenty-three year old.[66]  Officer Pool, who said that Hicks' punch landed on the right side of Officer Pool's mouth, reacted by punching Hicks in the face.[67]

---

[62]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 242, 253; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 20; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 138; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[63]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 242, 253; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 21; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 138; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[64]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 253; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[65]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 21, 22.

[66]    See id.; Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 274, 275.

[67]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 21; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

Officer Pool saw Hicks fall back and appear to hit his head on a concrete ledge in the attorney booth and fall motionless to the floor.[68]  Officer Taylor's perception was that Officer Pool and Hicks "kind of fell into" Attorney Booth #2.[69]  From Deputy Jameson's position behind the door, he could see only that Officer Pool moved toward Hicks and swung at him with a closed fist.[70]

At that point, Officer Taylor let go of the door to Attorney Booth #3 and moved closer to the Attorney Booth #2.[71]  Officer Pool was on his way out of the booth, and, as soon as he cleared the door, Deputy Jameson closed the door.[72]  Hicks was lying face down

---

[68]    See Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011 & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.  On the day of the Hicks' incident, Officer Pool stated that Hicks did not move or respond to verbal commands after falling to the floor.  See Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2011, & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.  However, at his deposition, Officer Pool stated that he observed Hicks "moving slightly, which [Officer Pool] interpreted to be [Hicks'] trying to get up" but left within a matter of seconds.  See Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty's Am. Mot., Dep. of Officer Pool p. 148.  Also at his deposition, Officer Pool said that Hicks rolled into a push-up position immediately after falling to the floor.  See id. pp. 150-51.  The court views this contradictory evidence in a light most favorable to Plaintiffs, as nonmovants.

[69]    Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 21.

[70]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 273, 286.

[71]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 21.

[72]    See id.; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

13

on the cement floor.[73]

Officer Pool told the other officers that he had feces all over his hands and was "going to clean up," and he left for the jail clinic.[74]  Officer Pool did not believe that Hicks was in medical distress and, without asking, assumed that the other officers would seek any necessary medical attention for Hicks.[75] Deputy Jameson closed the door, looked through the window in the door, and observed Hicks breathing and pushing up his body with his arms.[76]  Deputy Jameson asked Officer Taylor to check on Hicks.[77] Officer Taylor looked through the window in the door and saw Hicks pushing himself up and shaking his head.[78]  Officer Taylor saw no

---

[73]   See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 286, 321-22; Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 26; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[74]   Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 321; see also Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 26; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 1, Officer Pool's Voluntary Statement Dated Jan. 16, 2011, & Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[75]   See Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool pp. 148-50.

[76]   See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 341, 342.

[77]   See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 341; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[78]   See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 26-27, 58; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

blood on Hicks or anywhere in the attorney booth.[79] Officer Taylor did not request medical attention for Hicks, thinking that Deputy Jameson or Officer Pool would take care of that.[80]

Officer Taylor noticed that the inmate floor worker was finished cleaning and walked with him to dispose of the biohazard bag.[81] Officer Taylor then picked up Officer Tartamello's reports on the inmate disturbance from the floor control center, took the reports to the cellblock, and temporarily relieved Officer Tartamello from cellblock duty so that he could deliver the reports to the proper personnel.[82]

Deputy Jameson returned to his other duties, later stating that he perceived his responsibility to be to gather all of the facts before taking any other action.[83] Deputy Jameson "wanted to discuss the situation with Pool" before reporting the incident to a supervisor.[84] According to his training, Deputy Jameson

---

[79]   See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 27, 57.

[80]   Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 28.

[81]   See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 27-28, 34.

[82]   See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 28, 34, 35, 58-59; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 24.

[83]   See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 341, 344.

[84]   Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson p. 347; see also id. pp. 348, 354-55.

testified, he wanted to wait to make a report to his supervisor because he had not seen everything that transpired.[85]  None of the three officers notified Sergeant Wichkoski.[86]

At 6:15 p.m., Sergeant Wichkoski arrived back in the area where Deputy Jameson was on duty and inquired about Hicks.[87]  After Deputy Jameson informed Sergeant Wichkoski that Hicks had been moved because he had urinated and defecated, the sergeant looked through the window of Attorney Booth #2.[88]  Sergeant Wichkoski observed Hicks lying on the floor and, seeing no movement, opened the door only to discover that Hicks was not breathing.[89]  Sergeant Wichkoski ordered Deputy Jameson to stand watch at Attorney Booth #2 and instructed a detention officer to contact the clinic for an

---

[85]    See Doc. 124-1, Sealed App. A to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Deputy Jameson pp. 354-55.  At his deposition Deputy Jameson agreed that, during this time, Hicks was left alone in Attorney Booth #2 even though Deputy Jameson was aware of the possibility that Hicks could have been dying. See id. p. 349.

[86]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 22.

[87]    See id. ¶ 23; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[88]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶¶ 24-25; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[89]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶¶ 26-27; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

16

emergency response.[90]

The clinic staff arrived to assess Hicks.[91]  A nurse repeatedly asked what had happened, but neither Deputy Jameson nor Officer Pool reported the use-of-force incident.[92]  After Hicks had been loaded on a stretcher, Officer Pool finally informed Sergeant Wichkowski about the use of force.[93]

The clinic staff found Hicks unresponsive and without a pulse or respiration; the physician initiated cardiopulmonary resuscitation ("CPR") and administered epinephrine.[94]  After eight minutes of CPR, fire department personnel arrived and assumed CPR.[95] Hicks recovered a pulse and was transferred to Ben Taub Hospital.[96] Hicks arrived at the hospital at 7:13 p.m.[97]  Hicks survived for six days, dying on January 22, 2011.[98]

---

[90]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 28; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012, Ex. 2, Det. Command - Inmate Offense Rep. Suppl.

[91]    See Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[92]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 31.

[93]    See id. ¶ 32.

[94]    See Doc. 124-15, Sealed App. KK to Pls.' Opp'n to Harris Cty.'s Am. Mot., Chart Review.

[95]    See id.

[96]    See id.

[97]    See Doc. 124-4, Sealed App. T to Pls.' Opp'n to Harris Cty.'s Am. Mot., Autopsy of Hicks p. 2.

[98]    See id.

James C. Dalrymple ("Dalrymple") investigated the scene, taking photographs and measurements of the scene and collecting physical evidence.[99]  He wrote a report on the results of his investigation of the scene.[100]  Dalrymple reported that a "round sheet" was not on the door of the Attorney Booth #2.[101]  In the booth, Dalrymple observed a transfer blood stain with impact spatter on the top of a concrete ledge, an area of pooled blood with spatter on the floor under the ledge, another area of pooled blood near the first, and dripped blood along the floor, both inside and outside of the booth.[102]

An autopsy was performed on January 23, 2011.[103]  The medical examiner concluded that Hicks' death was caused by "[c]omplications of cardiac arrest due to atherosclerotic and hypertensive cardiovascular disease following blunt head trauma with nasal bone fracture" and that the manner of death was homicide.[104]

**B.**  **Training and Termination**

Jail personnel were required to satisfy Texas Commission on

---

[99]    See Doc. 109-5, Ex. 2 to Harris Cty.'s Am. Mot., Aff. of Dalrymple ¶ 11.

[100]    See id.

[101]    See id. ¶ 13.

[102]    See id. ¶¶ 15-18.

[103]    See Doc. 124-4, Sealed App. T to Pls.' Opp'n to Harris Cty.'s Am. Mot., Autopsy of Hicks p. 2.

[104]    Id. p. 1.

Law Enforcement ("TCOLE") licensing and training standards.[105] Jailers also received on-the-job training on a routine basis.[106] Officers Pool and Taylor reported attending a five-week "jail school," where they learned about and were tested on jail practices and standards, and receiving another five weeks of on-the-job training at their work assignments.[107]  Among the topics on which they were trained were crisis intervention, uncooperative and violent inmates, persons with mental impairments, use of force, de-escalation and escorting inmates to holding cells.[108]  Officer Tartamella stated that he successfully completed the basic course, the field training course, and all TCOLE-mandated use-of-force, defensive-tactics, mental-health, and other training courses.[109]

After the death of Hicks, a grand jury investigated but did not indict anyone.[110]  An Internal Affairs Division investigation

---

[105]    See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 3; Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 8.

[106]    See Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 8.

[107]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor p. 15; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool p. 18.

[108]    See Doc. 124-1, Sealed App. B to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Taylor pp. 51-52; Doc. 124-1, Sealed App. C to Pls.' Opp'n to Harris Cty.'s Am. Mot., Dep. of Officer Pool pp. 12, 58.

[109]    See Doc. 124-3, Sealed App. O to Pls.' Opp'n to Harris Cty.'s Am. Mot., Aff. of Tartamella ¶ 8.

[110]    See Doc. 109-2, Ex. 2 to Harris Cty.' Am. Mot., Letter from HCSO to Deputy Jameson Dated Aug. 21, 2012 p. 1; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

resulted in a finding that the officers had violated policies and procedures.[111]  On August 21, 2012, HCSO sent each officer a letter memorializing his termination.[112]

As reasons for the termination, the letter addressed to each officer cited the violation of HCSO policies and Detention Bureau procedures "by failing to perform your required duties."[113]  Officer Pool's letter added that he had been "untruthful during the course of the subsequent [Internal Affairs Division] investigation with respect to [his] actions."[114]  Specifically, all three letters stated that the officers failed to monitor and observe Hicks, failed to provide appropriate and timely medical care, and failed to report the incident.[115]  Officer Pool's letter also reiterated

---

[111]   See Doc. 109-2, Ex. 2 to Harris Cty.' Am. Mot., Letter from HCSO to Deputy Jameson Dated Aug. 21, 2012 p. 1; Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 44; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

[112]   See Doc. 109-2, Ex. 2 to Harris Cty.' Am. Mot., Letter from HCSO to Deputy Jameson Dated Aug. 21, 2012; Doc. 109-3, Ex. 3 to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Taylor Dated Aug. 21, 2012; Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 44; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012.

[113]   Doc. 109-2, Ex. 2 to Harris Cty.' Am. Mot., Letter from HCSO to Deputy Jameson Dated Aug. 21, 2012 p. 1; Doc. 109-3, Ex. 3 to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Taylor Dated Aug. 21, 2012 p. 1; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

[114]   Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012.

[115]   See Doc. 109-2, Ex. 2 to Harris Cty.' Am. Mot., Letter from HCSO to Deputy Jameson Dated Aug. 21, 2012 p. 1; Doc. 109-3, Ex. 3 to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Taylor Dated Aug. 21, 2012 p. 1; Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

the failure to provide a completely truthful account of the incident during the investigation.[116]  His letter made clear that Officer Pool was not being disciplined for the use of force because of the "rapidly evolving circumstances" but noted that Officer Pool's actions "may have had the effect of provoking, rather than de-escalating, the confrontation" with Hicks.[117]

The officers appealed their terminations to the Sheriff, and the terminations were affirmed.[118]  On appeal to the Civil Service Commission, Deputy Jameson and Officer Pool's terminations were modified to lengthy suspensions without benefits or pay and with a break in service.[119]  Officer Taylor's termination was affirmed.[120]

## C.  HCSO Detention Bureau Policies

HCSO had policies and procedures in place at the time that included the Department Policies Manual, the Standard Operating Procedures, Post Orders, Emergency Plans for Detention Operations,

---

[116]    Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

[117]    Doc. 124-2, Sealed App. I to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from HCSO to Officer Pool Dated Aug. 21, 2012 p. 1.

[118]    See Doc. 109-1, Ex. 1 to Harris Cty.'s Am. Mot., Officer Pool's Termination Package; Doc. 109-2, Ex. 2 to Harris Cty.'s Am. Mot., Deputy Jameson's Termination Package; Doc. 109-3, Ex. 3 to Harris Cty.'s Am. Mot., Officer Taylor's Termination Package.

[119]    See Doc. 109-1, Ex. 1 to Harris Cty.'s Am. Mot., Officer Pool's Termination Package; Doc. 109-2, Ex. 2 to Harris Cty.'s Am. Mot., Deputy Jameson's Termination Package.

[120]    See Doc. 109-3, Ex. 3 to Harris Cty.'s Am. Mot., Officer Taylor's Termination Package.

and directives.[121]   The requirement to review, understand, and follow the policies and procedures was a point of emphasis by human resources personnel and supervisors.[122]

HCSO's Standard Operating Procedure on inmate conduct covered the classification of inmates for reassignment to another housing location based on inmate conduct and the use of a suitable location for temporary confinement when no holding cell was available, among other situations.[123] Another Standard Operating Procedure addressed inmates with mental-health issues and informed employees of available mental-health resources to ensure that mental-health issues were directed to a specialist in a timely fashion.[124]

HCSO's Detentions Bureau policy on the use of force directed employees to use only "the amount of force necessary to protect themselves, another person, or to maintain the security of the detention facility."[125]   The policy provided definitions and examples of use of force events, listed the situations in which use of force may be used, identified prohibited uses of force, required

---

[121]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 7.

[122]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 7.

[123]   See Doc. 111-11, Sealed Ex. 22 to Harris Cty.'s Am. Mot., Standard Operating Proc. Addressing Inmate Conduct.

[124]   See Doc. 111-13, Sealed Ex. 25 to Harris Cty.'s Am. Mot., Standard Operating Proc. Addressing Inmates with Mental-Health Issues/CIRT Call-out Procs.

[125]   Doc. 124-14, Sealed App. U to Pls.' Opp'n to Harris Cty.'s Am. Mot., Det. Bureau Pol'y on Use of Force, Pol'y # D-307, Revised Aug. 19, 2010 & Nov. 26, 2011 p. 1.

22

that all use-of-force incidents be documented and reported, required that all inmates involved in a use-of-force event be medically evaluated regardless of injury or lack thereof, and warned that disciplinary action may result when the use of force was not in compliance with the policy.[126]

HCSO's department policy on use of force imposed on officers the duty of ensuring that any person injured or believed to be injured due to a use-of-force incident receive medical attention.[127] HCSO also had a department policy that imposed a duty to safeguard persons and property and prohibited "offensive, demeaning or uncomplimentary terms of speech or threatening or vulgar language" when speaking to or referring to an inmate.[128]

HCSO's post orders required that rovers monitor inmates placed in holdover cells, visitation or attorney booths for temporary separation purposes and complete round sheets on those inmates.[129] Another post order required that employees immediately notify the floor supervisor of all incidents involving physical

---

[126]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 38; Doc. 124-14, Sealed App. U to Pls.' Opp'n to Harris Cty.'s Am. Mot., Det. Bureau Pol'y on Use of Force, Pol'y #D-307, Revised Aug. 19, 2010 & Nov. 26, 2011 p. 1.

[127]   See Doc. 111-18, Sealed Ex. 40 to Harris Cty.'s Am. Mot., HCSO Dep't Pol'y on Use of Force, Pol'y #501.

[128]   See Doc. 111-19, Sealed Ex. 41 to Harris Cty.'s Am. Mot., HCSO Dep't Pol'y on Duty to Safeguard Persons & Prop., Pol'y #308.

[129]   Doc. 111-10, Sealed Ex. 18 to Harris Cty.'s Am. Mot., Post Order Floor Rover p. 1.

altercations and injuries to inmates.[130]   One standard operating procedure was dedicated to inmate health and medical emergencies.[131]

## D. **Officer Pool's Use-of-Force Reports**

According to his employee record, Officer Pool was involved in seven reported use-of-force incidents between October 18, 2009, and October 31, 2010.[132]  Plaintiffs' evidence includes both reports and witness statements for two of the incidents, reports without witness statements for three of them, and nothing for one of them.[133]

The record includes an inmate witness statement for an incident that occurred on March 26, 2010, corresponding with a date on which Officer Pool was noted as having been involved in a use-of-force incident, but the statement did not mention Officer Pool.[134]  The court found no other information about the March 2010 incident in the record and, thus, does not discuss it below. Additionally, there is a report of an incident on February 4, 2010,

---

[130]   See Doc. 109-9, Ex. 19 to Harris Cty.'s Am. Mot., Aff. of Wichkoski ¶ 17; Doc. 111-10, Sealed Ex. 18 to Harris Cty.'s Am. Mot., Post Order on Floor Rover p. 2; Doc. 111-12, Sealed Ex. 23 to Harris Cty.'s Am. Mot., Post Order on Performance of Duties (Daily Plan) p. 2.

[131]   See Doc. 111-14, Sealed Ex. 26 to Harris Cty.'s Am. Mot., Standard Operating Proc. on Inmate Health/Medical Emergency.

[132]   See Doc. 124-14, Sealed App. W to Pls.' Opp'n to Harris Cty.'s Am. Mot., Officer Pool's Employee History Report; 124-14, Sealed App. X to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated Oct. 31, 2010.  The identical Use-of-Force Report is in the record at Doc. 124-15, Sealed App. HH.

[133]   The court found nothing in evidence regarding the October 25, 2009 incident.

[134]   See Doc. 124-15, Sealed App. CC to Pls.' Opp'n to Harris Cty.'s Am. Mot., Suppl. Statement Dated Mar. 27, 2010.

that did not mention Officer Pool; however, he provided a witness statement and so did the inmate, who accused Officer Pool of kicking him.[135]   This incident was not listed on Officer Pool's employee record, and, thus, the court does not discuss it below.[136] The court describes the recorded accounts of the other incidents chronologically.

On October 18, 2009, Officer Pool and two other officers opened Attorney Booth #1 to handcuff the inmate inside, who was beating on the door.[137]   When Officer Pool placed his hand on the inmate's wrist in order to apply the handcuffs, the inmate "turned and began to swing at both officers."[138]   Officer Pool used an arm bar to take the inmate to the floor.[139]   The inmate grabbed the leg of one of the other officers and would not let go.[140]   Officer Pool and the third officer struggled with the inmate, but he refused to release the other officer's leg.[141]   In the midst of the fracas, the inmate "hit his face against the attorney booth's concrete bench

---

[135]   <u>See</u> Doc. 124-15, Sealed App. FF to Pls.' Opp'n to Harris Cty.'s Am. Mot., Suppl. Statement Dated Feb. 4, 2010, & Attachs.

[136]   <u>See</u> Doc. 124-14, Sealed App. W to Pls.' Opp'n to Harris Cty.'s Am. Mot., Officer Pool's Employee History Report.

[137]   <u>See</u> Doc. 124-15, Sealed App. DD to Pls.' Opp'n to Harris Cty.'s Am. Mot., Suppl. Statement Dated Oct. 18, 2009.

[138]   <u>Id.</u>

[139]   <u>See</u> <u>id.</u>

[140]   <u>See</u> <u>id.</u>

[141]   <u>See</u> <u>id.</u>

several times causing bruising and a small cut."[142]   A fourth officer pulled the inmate out of the attorney booth, and Officer Pool handcuffed the inmate.[143]   The inmate suffered a small cut on his forehead and bruising.[144] He was treated at the jail clinic and transported to the hospital for observation.[145]   The reviewing sergeant found the use of force "justified, reasonable and in accordance with Bureau and Departmental policy."[146]

On January 28, 2010, Officer Pool questioned an inmate about the possession of a contraband item.[147]   The inmate responded aggressively, and Officer Pool attempted to handcuff the inmate.[148] The inmate swung a closed fist at Officer Pool who stepped back to avoid the punch and then delivered a closed-fist strike to the right side of the inmate's face.[149]   The inmate fell to the ground and was handcuffed.[150] He suffered a chipped tooth as a result and was treated at the jail clinic.[151]   The reviewing sergeant

---

[142]   See id.

[143]   See id.

[144]   See id.

[145]   See id.

[146]   Id.

[147]   See Doc. 124-15, Sealed App. GG to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated Jan. 28, 2010.

[148]   See id.

[149]   See id.

[150]   See id.

[151]   See id.

26

determined, based on his investigation, that the use of force "was justified and in accordance with state law and department policy."[152]

On May 23, 2010, Officer Pool unsuccessfully attempted to forcibly restrain an inmate with an open hand in response to the inmate's verbal aggression and physical resistance.[153] The inmate struck another officer with an elbow to the face and struck Officer Pool in the face with a closed fist.[154] Officer Pool responded by striking the inmate several times in the face with closed fists.[155] The inmate continued to fight the officers until he was taken to the floor and handcuffed.[156] Officer Pool suffered minor injuries to the left side of his head and his right hand; the inmate suffered serious head trauma and was retained at the hospital.[157] An inmate witness reported that three officers "just out of [no where]" began hitting the other inmate in the face and body.[158] A sergeant reviewed the use-of-force report and found the force used

---

[152]   Id.

[153]   Doc. 124-15, Sealed App. Z to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated May 23, 2010.

[154]   See id.

[155]   See id.

[156]   See id.

[157]   See id.

[158]   Doc. 124-15, Sealed App. AA to Pls.' Opp'n to Harris Cty.'s Am. Mot., Suppl. Statement Dated May 24, 2010.

was "within the guidelines of policy, procedure, and the law."[159]

On July 30, 2010, an inmate struck an officer in the face, splitting the officer's upper lip.[160]  After the inmate swung but missed twice more, the officer kicked the inmate on his left inner thigh.[161]  Officer Pool responded to a page for assistance and used an open hand to forcibly restrain the inmate.[162]  The inmate was treated at the jail clinic.[163]

On October 31, 2010, an inmate was fighting with another inmate and assaulted the intervening staff member.[164]  Officer Pool responded to a request for assistance and attempted to grab the inmate's right wrist and apply an arm-bar take-down technique.[165] In the process Officer Pool injured his right forearm but, with the use of his hand, continued to assist in securing the inmate.[166] Another detention officer arrived and secured the inmate in

---

[159]     Doc. 124-15, Sealed App. Z to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated May 23, 2010.

[160]     See Doc. 124-15, Sealed App. EE to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated July 30, 2010.

[161]     See id.

[162]     See id.  Only a portion of the narrative is available in the record. See id.

[163]     See id.

[164]     See Doc. 124-14, Sealed App. X to Pls.' Opp'n to Harris Cty.'s Am. Mot., Use-of-Force Report Dated Oct. 31, 2010.

[165]     See id.

[166]     See id.

handcuffs.[167]   The inmate suffered facial bruising and swelling and a cut by his left eye and was treated at the jail clinic.[168]   A witness account by an inmate stated that Officer Pool hit the inmate in the ribs and face, and the officers beat the inmate more after securing him in his cell.[169]

**E.   Procedural Background**

On August 22, 2012, Plaintiffs, as heirs of Hicks, brought suit against Harris County, Officer Pool, and unnamed deputies.[170] The allegations included:

> 10.   As a direct and proximate result of the above described negligence, gross negligence, and deliberate indifference of the Defendants, HICKS sustained severe physical injury, resulting in his wrongful death.
>
> 11.   The actions and conduct of the Defendants regarding their failure to provide adequate care, well-being and safety of NORMAN F. HICKS, SR., while in the custody of the HARRIS COUNTY SHERIFF' [sic] DEPARTMENT, were objectively unreasonable.
>
> 12.   But for the failure to train and properly supervise detention officers employed by HARRIS COUNTY, the occurrence made the basis of this suit would not have occurred.
>
> . . . .
>
> 15.   Plaintiffs would further show that HARRIS COUNTY

---

[167]   See id.

[168]   See id.

[169]   See Doc. 124-14, Sealed App. Y to Pls.' Opp'n to Harris Cty.'s Am. Mot., Suppl. Statement Dated Oct. 31, 2010.

[170]   See Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 1, Pls.' Original Pet.

> SHERIFF'S DEPARTMENT permitted, encouraged,
> tolerated, and ratified a pattern and practice
> concerning the negligent processing, handling,
> detainment, security and transferring of mentally
> ill offenders, particularly Black offenders.
>
> . . . .
>
> 22. The foregoing acts and omissions are the result of
> customs and policies of the HARRIS COUNTY SHERIFF'
> [sic] DEPARTMENT.[171]

Plaintiffs specifically identified "a cause of action of assault against the Defendants," "a cause of action against HARRIS COUNTY, TEXAS, . . . under the Texas Tort Claims Act [("TTCA")] and the Texas Wrongful Death Act," and "negligent implementation of the policy on securing mentally ill criminal offenders by the HARRIS COUNTY SHERIFF'S DEPARTMENT."[172]

On November 26, 2012, Plaintiffs amended their petition, in part, to add a few allegations regarding the failure to provide Hicks with prompt medical care.[173] Plaintiffs also reorganized the presentation of their legal claims by identifying four specific causes of action.[174] The first two causes of action were drawn from the first petition: assault and "negligent implementation of the policy on providing medical treatment to and securing mentally ill criminal offenders" pursuant to the TTCA and the Texas Wrongful

---

[171] Id. pp. 3-5.

[172] Id. p. 4.

[173] See Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 15, Pls.' 1st Am. Pet.

[174] See id. pp. 5-7.

Death Act.[175]   Assault was specifically alleged against the individual defendants only, and the second cause of action was alleged against Harris County only.[176]

The most significant difference between the original and amended petitions was the addition of two constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983").   The first constitutional claim articulated by Plaintiffs alleged:

> 27.   As a direct and proximate result of the use force against HICKS, which was objectively unreasonable, HICKS was deprived of life and liberty without due process of law secured to him by the Fifth and Fourteenth Amendments to the Constitution of the United States for which the Plaintiffs have injuries both physical and mental.[177]

The second claim stated:

> 27.   [sic] As a result of the failure to properly supervise and train its Deputies, [Harris County] has permitted a pattern of conduct which subjects Harris County Jail detainees, particularly those with mental health issues, to beatings, assaults and intimidation while in custody.[178]

Plaintiffs further alleged that the acts described in the petition "were done willfully, maliciously, and with callous and reckless indifference to and disregard of HICK's safety and continued life."[179]   Within one month of receipt of Plaintiffs' amendment,

---

[175]   Id. p. 5.

[176]   See id.

[177]   Id. p. 6.

[178]   Id. pp. 6-7.

[179]   Id. p. 7.

Harris County[180] removed the case based on federal-question jurisdiction.[181]

In April 2013, when Plaintiffs' counsel was denied admission pro hac vice, Plaintiffs were granted time to obtain new counsel.[182] Plaintiffs' new counsel made an appearance on July 3, 2013.[183]  Upon the parties' joint request, the court reset the scheduling conference for October 15, 2013.[184]  The court entered a docket control order that, among other deadlines set, required amended pleadings to be filed by December 6, 2013.[185]

On February 19, 2014, Plaintiffs voluntarily dismissed the unnamed deputies without prejudice.[186]  On February 20, 2014, two and one-half months after the court's deadline for amending pleadings, Plaintiffs filed an opposed motion for leave to amend their first amended petition.[187]  Plaintiffs stated therein that

---

[180]    At the time of removal, Officer Pool had not been served either the original or the amended petition.  See Doc. 1, Notice of Removal pp. 1, 2.

[181]    See Doc. 1, Notice of Removal pp. 1-2; Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 1, Pls.' Original Pet.; Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 15, Pls.' 1st Am. Pet.

[182]    See Doc. 9, Ord. Dated Apr. 25, 2013; Doc. 11, Mot. for Extension of Time to Obtain New Counsel; Doc. 12, Ord. Dated May 22, 2013.

[183]    See Doc. 13, Notice of Appearance.

[184]    See Doc. 17, Jt. Mot. to Reschedule Scheduling Conference; Doc. 19, Notice of Reset.

[185]    See Doc. 24, Docket Control Ord.

[186]    See Doc. 36, Pls.' Notice of Dismissal.

[187]    See Doc. 39, Pls.' Mot. for Leave to File Am. Pleading & Req. for Hr'g.

they sought to "include appropriate federal causes of action" and to delete the dismissed unnamed deputies.[188]  They represented that they would "not be asserting any facts or causes of action that Defendants were not initially aware of from their pleadings filed in state court."[189]  Defendants opposed leave on the grounds that the amendment substantially broadened the claims alleged, significant discovery had already been completed, and Plaintiffs had not met the Federal Rule of Civil Procedure ("Rule") 16(b) good-cause standard for amending a pleading after the expiration of the court-ordered deadline.[190]

On March 12, 2014, the court denied the motion.[191]  The court found that Plaintiffs' proposed amended complaint sought to broaden their claims against Defendants, which went beyond their professed desire to conform the pleadings to the federal standards and to the current status of the case.[192]  The court further found that, although Plaintiffs had retained new counsel of record, the counsel entered appearances well before the pleading amendment deadline of

---

[188]   Id. p. 1.

[189]   Id. p. 3.

[190]   See Doc. 45, Defs.' Resp. in Opp'n to Pls.' Mot. for Leave to Am. pp. 2-4.

[191]   See Doc. 46, Ord. Dated Mar. 12, 2014.

[192]   See id. p. 2.

December 6, 2013.[193]  The court concluded that Plaintiffs had fallen

"considerably short of meeting the Rule 16(b)(4) good cause

standard," and the amendment would require additional discovery at

a late stage in the litigation.[194]

Disputes and extensions of time delayed the completion of

discovery and the filing of dispositive motions.[195]  On February 27,

2015, Harris County filed dispositive motions based on

representative capacity, on the TTCA, and on the merits, as well as

motions to exclude expert testimony.[196]  On the same day, Officer

Pool joined Harris County's motions to exclude expert testimony and

filed a dispositive motion on qualified immunity and limitations.[197]

Harris County filed an amended dispositive motion on the merits the

---

[193]    Id.  In fact, Plaintiffs' counsel of record made an appearance three
months prior to the scheduling conference, at which the deadline for amending the
pleadings was set.  See Doc. 13, Notice of Appearance; Doc. 23, Min. Entry Dated
Oct. 15; Doc. 24, Docket Control Ord.

[194]    Doc. 46, Ord. Dated Mar. 12, 2014 p. 4.

[195]    See, e.g., Doc. 47, Mot. to Quash & for Protective Ord.; Doc. 52,
Officer Pool's Unopposed Mot. to Extend Deadlines; Doc. 53, Harris Cty.'s
Unopposed Mot. to Extend Deadline Within Which to Designate Experts & to Produce
Expert Reports; Doc. 54, Ord. Dated May 27, 2014; Doc. 55, Ord. Dated May 27,
2014; Doc. 68, Mot. to Quash the Dep. with Subpoena Duces Tecum of Roy Tim
Gravette; Doc. 71, Mot. to Quash Deps. Noticed by Pls.; Doc. 73, Min. Entry Ord.
Dated June 25, 2014; Doc. 76, Jt. Mot. to Extend Dispositive & Nondispositive
Mots. Deadline; Doc. 77, Ord. Dated Sept. 11, 2014.

[196]    See Doc. 94, Harris Cty.'s Mot. to Exclude or, in the Alt., to Limit
the Test. & Expert Rep. of Pls.' Expert, Roy Tim Gravette; Doc. 95, Harris Cty.'s
Mot. to Limit the Test. & Expert Rep. of Pls.' Expert, Arthur Copeland; Doc. 96,
Harris Cty.'s Mot. to Dismiss Pls.' St. Law Assault Cl. Against Officer Pool
Under § 101.106 of the Tex. Tort Cls. Act; Doc. 97, Harris Cty.'s Mot. to Dismiss
Pls.' Cls. Brought Asserting Representative Capacity; Doc. 106, Harris Cty.'s
Mot. to Dismiss, for J. on the Pleadings, & for Summ. J.

[197]    See Doc. 113, Officer Pool's Mot. Joining in Co-Def. Harris Cty.'s
Mots. to Strike; Doc. 114, Officer Pool's Mot. for J. on the Pleadings & for
Summ. J.

following day to correct errors in the motion's tabular array and to include inadvertently omitted exhibits.[198]

On April 10, 2015, Plaintiffs moved to voluntarily dismiss with prejudice all claims against Officer Pool, and the court granted the motion.[199]   On that same day, Plaintiffs also responded to Harris County's pending motions.[200]   In their response to Harris County's amended motion on the merits, Plaintiffs again sought, should the court find their complaint insufficient to state a claim for relief, leave to amend in order that the complaint conform to the discovery taken in the case.[201]

Harris County filed a motion to strike Plaintiffs' response because, Harris County contended, the responsive arguments went beyond the allegations in Plaintiffs' live pleading.[202]   Harris County also moved to suspend the briefing schedule until the court resolved the matter of whether Plaintiffs would be permitted to

---

[198]     See Doc. 108, Harris Cty.'s Am. Mot. for Leave to File Am. Mot.; Doc. 109, Harris Cty.'s Am. Mot. & Exs.; Doc. 110, Exs. to Harris Cty.'s Am. Mot.; Doc. 111, Sealed Exs. to Harris Cty.'s Am. Mot.

[199]     See Doc. 119, Pls.' Unopposed Fed. R. Civ. P. 41(a) Mot. to Dismiss Officer Pool; Doc. 129, Ord. Dated Apr. 22, 2015.

[200]     See Doc. 120, Pls.' Resp. to Harris Cty.'s Mot. to Dismiss Pls.' Cls. Brought in a Representative Capacity; Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot.; Doc. 125, Pls.' Resp. to Harris Cty.'s Mot. to Exclude or, in the Alt., to Limit the Test. & Expert Rep. of Pls.' Expert, Roy Tim Gravette; Doc. 127, Pls.' Resp. to Harris Cty.'s Mot. to Exclude or, in the Alt., to Limit the Test. & Expert Rep. of Pls.' Expert, Arthur Copeland.

[201]     See Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot. p. 38.

[202]     See Doc. 134, Harris Cty.'s Emergency Mot. to Strike Pls.' Previously Unpled Cls. & Theories of Liability & Resp. in Opp'n to Pls.' Alt. Mot. for Leave to Am.

pursue allegedly unpled claims and theories of liability and/or amend their complaint.[203]

On May 19, 2015, the court addressed Plaintiffs' motion for leave to amend and Harris County's motions to strike and to suspend the briefing schedule.[204]   The court again denied Plaintiffs' request to amend, stating:

> Discovery concluded months ago.  The dispositive and nondispositive motions deadline has passed.  The court denied a motion for leave to amend filed by Plaintiffs in February 2014 because Plaintiffs failed to demonstrate good cause as required by Federal Rule of Civil Procedure 16.  Plaintiffs' pending motion does nothing to prompt the court to change its ruling.[205]

The court also denied Harris County's motions, stating that the court would consider, when deciding Harris County's dispositive motion, whether Plaintiffs' response brief improperly raised unpled claims and theories of liability.[206]

The court begins with Harris County's two nondispositive motions.  The court then turns to Harris County's dispositive motion.  In the process, the court lays out Plaintiffs' claims and theories of liability that were properly pled and remain in the case, thereby resolving in full whether Plaintiffs' response brief

---

[203]   See Doc. 133, Harris Cty.'s Emergency Mot. to Suspend Briefing Deadlines Pending the Ct.'s Disposition of Harris Cty.'s Mot. to Strike Pls.' Previously Unpled Cls. & Theories of Liability & Resp. in Opp'n to Pls.' Alt. Mot. for Leave to Am.

[204]   See Doc. 135, Order Dated May 19, 2015.

[205]   Id. pp. 1-2.

[206]   Id. p. 2.

raised unpled claims and theories of liability.

## II.  Harris County's Nondispositive Motions

Harris County filed two motions to strike, one concerning Plaintiffs' Exhibit PP and one concerning Plaintiffs' supplemental response brief to Harris County's dispositive motion.  The court finds it unnecessary to strike either one.

Exhibit PP is a letter dated June 4, 2009, from the Acting Assistant Attorney General to Harris County Judge Ed Emmett concerning an investigation by the Civil Rights Division of the U.S. Department of Justice into the conditions at the Harris County Jail.[207]  Harris County seeks to strike the exhibit for lack of trustworthiness.[208]  Plaintiffs cite the letter in one section of their response.[209]  Plaintiffs point to the portions of the letter expressing opinions derived from the investigation, including that inadequacies were present in access to mental-health treatment and in Harris County's use-of-force procedures.[210]  Plaintiffs connect these opinions to their assertions that HCSO training was inadequate and that implementation of Harris County's policies was

---

[207]    See Doc. 124-16, Sealed App. PP to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from Loretta King to Judge Ed Emmett Dated June 4, 2009.

[208]    See Doc. 137, Harris County's Objections to & Mot. to Strike Ex. PP to Pls.' Opp'n to Harris Cty.'s Am. Mot.

[209]    See Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot. p. 36.

[210]    See id. p. 36.

negligent.[211]

The letter falls within public-record exception to the hearsay rule because it is the statement of a division of the U.S. Department of Justice and includes factual findings from a legally authorized investigation. Federal Rule of Evidence 803(8). Harris County's concerns about the motivation behind the investigation and the intended use of the results do not change the court's admissibility determination.

That said, the letter is of limited value. To the extent that the letter is offered as evidence that Harris County was aware of the opinions of an outside public office regarding conditions of confinement and employee acts, it arguably suggests Harris County's knowledge of patterns of unconstitutional conduct at the jail. To the extent that the letter is offered as evidence of the conditions of the jail and any pattern of possibly unconstitutional conduct while Hicks' was detained there two years later, it has no relevance. For purposes of summary judgment, the court considers it only as evidence of notice.

Concerning Harris County's nondispositive motion to strike Plaintiffs' supplemental brief regarding governmental immunity, the court's practice is, where possible, to consider all briefing. Below, the court recognizes Plaintiffs' claim under the TTCA to allege only the negligent implementation of policy, which should

---

[211]    See id. pp. 36-37.

38

assuage Harris County's concern about the supplemental brief's discussion of allegedly negligent use of attorney booths.

### III.  Harris County's Dispositive Motion

Although Harris County's motion is filed as a motion to dismiss and a motion for judgment on the pleadings as well as a motion for summary judgment, both parties have submitted and relied on evidence outside the pleadings.  The court addresses the motion only as one for summary judgment and considers all competent summary judgment evidence.  That said, Plaintiffs are limited to the claims raised in their live pleading.  The amended petition is inartfully pled, and it is vague and confusing.  However, the court will not strictly construe the pleading to eliminate claims that were pled well enough to put Harris County on notice.

Plaintiffs alleged that Harris County negligently implemented its policies "on providing medical treatment to and securing mentally ill criminal offenders."[212]  The complaint did not include any facts regarding the use of an attorney booth or the absence of a round sheet in Hicks' case, much less any allegation that attorney booths or round sheets were tangible personal or real property, the use of which caused Hicks' injuries and death.  Thus, Plaintiffs are limited to the claim as pled—negligent implementation of policies.

---

[212]     Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 15, Pls.' 1st Am. Pet. p. 5.  By dismissing the unnamed deputies and Officer Pool, Plaintiffs' assault claim against the individual defendants was also dismissed.

In the other two identified causes of action, Plaintiffs poorly stated the exact nature of their constitutional claims. Based on the entire amended petition, the court understands Plaintiffs to be complaining that Hicks' constitutional rights were violated through: (1) the use of excessive force; (2) the deliberate indifference to his safety and medical needs by placing him in general population despite knowledge that he was schizophrenic; and (3) the deliberate indifference to his medical needs after the physical confrontation with Officer Pool.

The court further finds that the live pleading raised the allegation that Harris County policies caused these alleged constitutional violations.   The court has identified two Harris County policies articulated in the amended petition: (1) Permission, encouragement, toleration, and ratification of a pattern and practice of negligent treatment of mentally ill inmates; and (2) Failure to train and supervise detention officers, particularly on the use of force.

**A.   Summary Judgment Standard**

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as

40

critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof.  See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).

If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla

of evidence will not carry this burden.  <u>Brown v. City of Houston,
Tex.</u>, 337 F.3d 539, 540-41 (5th Cir. 2003).

## B.  <u>Analysis</u>

Plaintiffs' case includes a negligence claim under state law
and constitutional claims under federal law.  Harris County moves
for dismissal of all of Plaintiffs' causes of action.

### 1.  Negligence Claim

Texas governmental units enjoy immunity from tort claims
unless Texas has consented to allowing suit.  <u>Tex. Dep't of Parks
& Wildlife v. Miranda</u>, 133 S.W.3d 217, 224 (Tex. 2004).  Texas
waives immunity for negligence claims in a limited number of
situations described in the TTCA.[213]  Thus, Harris County is immune
from suit on Plaintiffs' negligence claim unless it fits within the
waiver parameters of the TTCA.  Generally, the TTCA waives immunity
for property damage, personal injury and death caused by wrongful
acts of employees if arising from the operation or use of a motor-
driven vehicle or from a condition or use of tangible personal or
real property.[214]  <u>See</u> Tex. Civ. Prac. & Rem. Code § 101.021.

---

[213]   Tex. Civ. Prac. & Rem. Code §§ 101.001-101.109.

[214]    In its motion to strike Plaintiffs' supplemental brief, Harris County
repeats an argument from a footnote in its amended dispositive motion.  That
argument was that counties were "expressly excluded from liability under the
Texas Wrongful Death Act" and that any liability for wrongful death was imposed
by the TTCA.  Doc. 159, Harris Cty.'s Mot. to Strike Pls.' Suppl. Brief in Opp'n
to Harris Cty.'s Assertion that it is Entitled to Gov'tal Immunity p. 2 (citing
<u>Webb Cty., Tex. v. Sandoval</u>, 88 S.W.3d 290, 296 (Tex. App.—San Antonio 2002, no
pet.)).  Plaintiffs respond that they may pursue wrongful death under Section
1983 for civil rights violations and that counties are not exempt from liability
for a wrongful-death claim that fits within the waiver provisions of the TTCA.
Doc. 162, Pls.' Resp. to Harris Cty.'s Mot. to Strike Pls.' Suppl. Brief in Opp'n

Plaintiffs' amended complaint alleged that Harris County negligently implemented its "policy on providing medical treatment to and securing mentally ill criminal offenders."[215]   The key in this case is whether Hicks' death was caused by either the operation or use of a vehicle or a condition or use of tangible personal or real property.

In response to Harris County's motion, Plaintiffs argue that, primarily, the use of attorney booths as holding cells and, secondarily, the failure to use a round sheet on the door of either attorney booth caused Hicks' death and amounted to the negligent implementation of Harris County policy.   Neither attorney booths nor round sheets were mentioned in Plaintiffs' live pleading. Harris County cannot be made to guess on what tangible property, if any, Plaintiffs may decide later in litigation to base their theory of negligence or be made to guess the way in which that tangible property played a role in either the implementation of policy or Hicks' death.   Plaintiffs' live pleading simply did not mention the use of any tangible property leading to Hicks' death.

Plaintiffs argue, in their supplemental brief, that <u>Texas v. Terrell</u>, 588 S.W.2d 784, 788 (Tex. 1979), held that "immunity is

---

to Harris Cty.'s Assertion that it is Entitled to Gov'tal Immunity p. 2 (unnumbered).   Regardless of the nuanced differences, the parties agree that the negligence claim resulting in the alleged wrongful death of Hicks is subject to the TTCA's provisions.

[215]     Doc. 10, Attach. 3 to Notice of Removal, Am. Index of Matters Filed Upon Removal, Doc. 15, Pls.' 1st Am. Pet. p. 5.

waived if the injury is caused by the negligent implementation of policy."[216]   That case was brought against the State of Texas and a highway patrol officer on the allegation that he negligently operated his patrol car when he pulled out from the shoulder to pursue a speeder and his patrol car collided with the plaintiff's vehicle.   Id. at 785.   The issue before the court was whether Texas was entitled to sovereign immunity based on an exception to the TTCA's waiver for the officer's alleged negligence in the operation of a motor vehicle.   See id. at 785-86.

In its analysis of exceptions to the waiver of immunity, the Supreme Court of Texas mused that a negligence claim might exist under the TTCA for the negligent implementation of a policy as opposed to the negligent formulation of a policy.   See id. at 786-88.   The court held that no exception to the waiver of immunity applied and the State was liable for injuries resulting from the highway patrol officer's negligence, if any.   See id. at 788.   The point is irrelevant in the case sub judice, though, because Terrell involved the alleged negligent operation of a motor vehicle for which the TTCA waives sovereign immunity.   Where the Terrell claim fit within the waiver of immunity for negligence claims because it involved the official use of a motor vehicle, Plaintiffs here pled no facts to support a statutory waiver for their negligence claim.

---

[216]     Doc. 156, Pls.' Suppl. Brief in Opp'n to Harris Cty.'s Assertion that it is Entitled to Gov'tal Immunity p. 3.

44

Summary judgment should be granted in favor of Harris County on Plaintiffs' negligence claim.

## 2.  Constitutional Claims

A plaintiff can establish a prima facie case under Section 1983[217] for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law.  Doe v. Rains Cty. Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995).  The statute creates no substantive rights but only provides remedies for deprivations of rights created under federal law.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Plaintiffs' three constitutional claims are all rooted in the Fourteenth Amendment due process guarantees:[218] (1) excessive force

---

[217]    The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

[218]    Harris County argues that the Eighth Amendment applies because Hicks was picked up on a probation violation post-conviction.  Harris County relies on Hamilton v. Lyons, 74 F.3d 99, 102 (5th Cir. 1996), a case in which a parolee who had been arrested for multiple new felony counts challenged the conditions of his confinement at the jail prior to the trial on the new charges.  Harris County has failed to convince the court that the plaintiff in Hamilton, who was a post-incarceration parolee facing new charges and challenging conditions of confinement, is sufficiently analogous to Hicks, who was a probationer on deferred adjudication facing a charge that he violated probation and allegedly suffering injuries and death as a result of episodic acts and omissions.  Therefore, the court assumes, for purposes of analysis, that Hicks was a pretrial

while a pretrial detainee; (2) deliberate indifference to safety and mental-health medical needs; (3) deliberate indifference to physical medical needs.  The Fourteenth Amendment states, in part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1.

### a.  Evidence of Constitutional Violations by State Actors

The appropriate standard for determining whether a pretrial detainee has been subjected to excessive force is solely an objective one.  Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466, 2473 (2015).  The question is whether the officer "purposely or knowingly" used force against the detainee that "was objectively unreasonable."  Id.  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham, 490 U.S. at 396).  Whether the threat was unreasonable should determined from the perspective of a reasonable officer facing the same circumstances and taking into consideration only what the officer on the scene knew at the time of the use of force. Id.  Multiple factors may bear on whether the force was reasonable, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the [detainee's] injury; any effort made by the officer to

---

detainee as he was awaiting a hearing on the charged probation violation. Pretrial detainees are protected by the Fourteenth Amendment's Due Process Clause.  See Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466, 2470, 2473 (2015).

> temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the [detainee] was actively resisting.

Id. (citing Graham, 490 U.S. at 396).

Thus, in order to show that Officer Pool violated Hicks' right to be free from excessive force, Plaintiffs must show that a reasonable officer, with the information that Officer Pool had at the time of the incident, would not have used the same degree of force employed by Officer Pool. Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466, 2473 (2015). The evidence shows that Hicks had been cooperative and had complied with all verbal orders, that two other officers were in proximity to the altercation, that Hicks was seventy-two years old, that Officer Pool was twenty-three, and that Officer Pool was aggravated by Hicks' tossing his feces-laden shirt at Officer Pool. These facts alone are sufficient to raise the question whether a reasonable officer would have resorted to punching Hicks as Officer Pool did.

Plaintiffs' claims that Hicks was unconstitutionally placed in the general population despite his mental-health condition and left for approximately fifteen minutes without medical care despite his physical-health condition are subject to the deliberate-indifference analysis.

Pretrial detainees enjoy the same rights as convicted prisoners to "constitutional essentials like medical care and safety." Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 393

47

(5th Cir. 2000).    Thus, courts have adopted the deliberate indifference standard from Eighth Amendment cases to analyze pretrial detainees' claims of deprivation of "basic human needs, including medical care and protection from harm" during confinement.  Id. (quoting Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996)).   Negligent action on the part of an officer does not implicate constitutional rights.   Id. at 395 (quoting Hare, 74 F.3d at 645-46); see also Lawson v. Dallas Cty., 286 F.3d 257, 262-63 (5th Cir. 2002)("Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone.").   In fact, deliberate indifference is a higher threshold than even gross negligence.  Hare, 74 F.3d at 645.

To prove a violation of Hicks' right to be free of deliberate indifference to his safety and medical needs, Plaintiffs must show that the detention employees' conduct "demonstrate[d] subjective awareness of a substantial risk of serious harm and a failure to take reasonable measures to abate [the] risk." Kitchen v. Dallas Cty., 759 F.3d 468, 482 (5th Cir. 2014).  To be serious, the medical need must have been either one for which treatment was recommended or one that was so obvious as to be recognizable by a lay person as needing medical attention.  Id.

With regard to Hicks' placement in general population, the evidence shows that Hicks revealed during intake that he had been

48

diagnosed with schizophrenia.  The intake psychiatrist, who placed Hicks in general population, was not only aware of Hicks' psychiatric diagnosis but also that Hicks was previously hospitalized for mental-health treatment.  The psychiatrist further knew that Hicks had been prescribed psychiatric medications, that Hicks did not know when he last had taken them, and that Hicks refused to take medications while in jail.  The psychiatrist acknowledged that medication could not be forced on Hicks because he was not a danger to himself or others.  Despite knowledge of Hicks' unmedicated, serious psychiatric condition, the psychiatrist classified Hicks as appropriate for general population.

The evidence also shows that Hicks was involved in three altercations in the short time he was housed at the jail.  Two incidents occurred on January 10, 2011, just two days after his intake.  One involved arguing with other inmates, and one involved throwing water bottles at cells and arguing with other inmates. Hicks' behavior prompted referrals for psychiatric screening by two separate officers.  Both referrals were assigned routine priority, even though both occurred on the same day and the second incident evidenced negative escalation.  Hicks had not yet been assessed when a third referral was made on January 16, 2011.  On that date, Officer Tartamella referred Hicks for psychiatric assessment because Hicks assaulted another inmate with a towel.  This incident led to Hicks' removal from the cellblock and, ultimately, his

deadly encounter with Officer Pool.

These facts are sufficient to raise a question whether HCSO staff were deliberately indifferent to Hicks' safety and mental-health needs.

The third alleged constitutional violation hardly needs a discussion on the existence of a fact issue regarding Deputy Jameson, Officer Taylor, and Officer Pool's deliberate indifference to Hicks' serious medical needs.  There is no dispute that none of the officers reported the incident or requested medical attention for Hicks.  The evidence indicates that two of the officers observed Hicks moving slightly and trying to push himself up off the floor while Officer Pool actually observed Hicks hit his head on a cement bench or ledge in the attorney booth and then fall on the floor motionless.

Although Deputy Jameson and Officer Taylor stated that their observations suggested to them that Hicks would be fine, they both also testified that they thought one of the other officers would contact medical personnel.  Officer Pool left to take care of his health and welfare needs at the jail clinic but neglected to mention that Hicks took a serious blow to his head and might need medical attention.

The officers' knowledge of what happened and observations of Hicks were enough for a lay person to be aware of the substantial risk that Hicks was seriously harmed.  Whether they were

50

deliberately indifferent or merely grossly negligent is a fact issue.

### b.  Evidence of Harris County Policies

A county may be held liable under Section 1983 only for its own illegal acts, not pursuant to a theory of vicarious liability. Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011)(quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)); see also Kitchen, 759 F.3d at 476.  Liability may be imputed to the county only "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation."  Connick, 131 S. Ct. at 1359 (internal quotation marks omitted)(quoting Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 692 (1978)).

To succeed on a claim against a county under Section 1983, the plaintiff must establish, not only that an individual state actor violated his constitutional rights, but that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." Peterson v. City of Fort Worth, Tex., 588 F.3d 838, 847 (5th Cir. 2009)(citing Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)); see also Kitchen, 759 F.3d at 476-77.  "Official [local-government] policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."

Connick, 131 S. Ct. at 1359; see also Peterson, 588 F.3d at 850.
Evidence of an unconstitutional custom or practice is not enough;
policymakers for the local government must be chargeable with
awareness of the illegal custom or practice. See Pineda v. City of
Houston, 291 F.3d 325, 330-31 (5th Cir. 2002).

Thus, in order to show that Harris County itself caused the
alleged constitutional violations, Plaintiffs must produce evidence
of a decision by a Harris County lawmaker, an act of its
policymaking official(s), or a persistent practice that was the
driving force behind Hicks' injuries.  Plaintiffs alleged no
decision of a lawmaker or act of an official but articulated two
informal county policies: (1) Permission, encouragement,
toleration, and ratification of a pattern and practice of negligent
treatment of mentally ill inmates; and (2) Failure to train and
supervise detention officers, particularly on the use of force.

In their response, Plaintiffs expound and expand on the
policies that they contend caused Hicks' injuries and death.
There, Plaintiffs argue that these "policies, customs, and
conditions did not pass constitutional muster:" (1) those that
"resulted in the excessive use of force against Mr. Hicks;" (2)
those that "permitted the improper use and placement of inmates .
. . in [a]ttorney [b]ooths;" (3) those that "permitted the
placement of mentally ill inmates . . . in the general population;"
and (4) those that resulted in the improper delay of treatment of

inmates . . . in medical distress.

Plaintiffs also alter the nature of their failure-to-train allegations, stating that they alleged sufficient facts to show that Harris County was deliberately indifferent to the constitutional rights of inmates by failing to provide adequate training on "the use of deadly force, the detainment, handling and security of mentally ill inmates, and the rendering of medical assistance."[219] However, Plaintiffs directly address none of these in their discussion but, rather, address training deficiencies in the areas of responsibility for requesting medical assistance in use-of-force incidents involving multiple officers and responsibility for placing and completing round sheets for inmates temporarily held in attorney booths.

In response to a motion for summary judgment, a plaintiff may no longer rest on allegations but must present evidence in order to raise genuine issues of material facts. The court finds that Plaintiffs fail to present sufficient evidence to raise a genuine dispute of material fact on any of the originally pled or subsequently added alleged policies.

The court first addresses the allegation that Harris County tolerated a custom of using excessive force against inmates.[220]

---

[219]   Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot. p. 33.

[220]   Plaintiffs mentioned, in different places, both that the use of excessive force is greater against African-American and against mentally ill inmates.  As they fail to show a pattern of excessive-force incidents against inmates in general, these distinctions are immaterial.

Plaintiffs' evidence shows that Officer Pool had seven reported use-of-force incidents in one year's time.  The number of incidents may seem shocking to a layperson, but even a high number of use-of-force incidents does not necessarily mean that Harris County had or should have had knowledge of a pattern of incidents of *excessive-force*.

The record contains no evidence that any of those seven uses of force were found to be excessive; in fact, three of the written reports indicate that the reviewing officer found those uses to be justified.[221]  Plaintiffs' evidence fails to raise a fact question of a pattern of Officer Pool's use of *excessive* force, much less a widespread pattern of officers using *excessive* force at the Harris County Jail.  Moreover, the court has reviewed each report and finds no indication that the force was obviously excessive to the need in any of the situations where force was applied and reported.

Regarding the use of attorney booths as temporary holding cells, the court previously noted that Plaintiffs did not mention attorney booths at all in their live pleading, much less an allegedly unconstitutional policy of using them as holding cells. Even if Plaintiffs were able to establish that Harris County had a policy of using the attorney booths as temporary holding cells, which appears to be the case, there is no evidence that the use of

---

[221]  One report is incomplete and does not indicate what the reviewing officer's opinion was.  One report lacks a statement approving or disapproving the use of force.  No Use-of-Force report and, thus, no statement by the reviewing officer is in the record for either of the other two incident dates.

attorney booths as holding cells was the moving force behind the violation of any constitutional right, including the violations alleged by Plaintiffs on behalf of Hicks.

Plaintiffs make no effort to demonstrate a pattern of constitutional injuries to mentally ill inmates resulting from negligent processing, handling, detainment, security, or transfer as alleged in their live pleading. In fact, Plaintiffs mention no other mentally ill inmates who suffered any harm as a result of Harris County's practices of processing, handling, detainment, security, or transfer. Rather, Plaintiffs rely solely on Hicks' treatment during his brief time at the jail as evidence of a pattern.

Plaintiffs point to the notations on the intake form that "Hicks was confused, difficult to understand, had an illogical thought process, and suffered from schizophrenia."[222] They argue that this information and access to Hicks' psychiatric treatment history put Harris County on notice, yet it was "deliberately [sic] about the fact that ignored [sic] Mr. Hicks was diagnosed with" a variety of psychiatric conditions.[223] This evidence does not establish a policy; it is simply evidence of Hicks' treatment, which may or may not tend to support the allegation that he suffered a constitutional violation at the hands of individual

---

[222]   Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot. p. 29.

[223]   <u>Id.</u>

state actors.

Plaintiffs further cite the director of the mental-health services, who concluded that Hicks "would not have been housed" in the mental-health unit.[224]   Their point is unclear, but perhaps they are suggesting that the standard by which the decision to house in the mental-health unit is unconstitutional.  If so, they have failed to adduce sufficient evidence to determine whether it the policy on its face was unconstitutional (which they did not specifically plead) or to show a pattern of constitutional harm to mentally ill inmates, similar in diagnoses to Hicks, who were housed with the general population.

Plaintiffs cite Hicks' three referrals for a psychiatric assessment as evidence of a pattern of unconstitutional custom because, they argue, "the Harris County facility dangerously disregarded the content within the reports and were [sic] deliberately indifferent to the content of the officers' referrals concerning Mr. Hicks by deeming them inconsequential."[225]   Again, that evidence only goes to whether Hicks suffered constitutional harm at the hands of a state actor, not whether Harris County itself caused the alleged constitutional violation.

Although Plaintiffs alleged that Hicks' constitutional rights were violated by the failure to render medical care after Officer

---

[224]   Id.

[225]   Id. p. 31.

Pool hit Hicks, they did not allege or provide evidence of a Harris County formal or informal policy that was the moving force behind the failure to render medical care in this instance.   Harris County's written policy required that all uses of force be reported and that all inmates involved in use-of-force incidents be medically evaluated regardless of injury.   Plaintiffs present no evidence of a pattern of failure to render medical aid but relies solely on this one incident.  Without any evidence of a pattern of unconstitutional conduct so widespread as to alert Harris County of its existence, Plaintiffs cannot show that a policy was the moving force behind Hicks' injuries and death.

Courts have recognized that, under limited circumstances, the failure to train or to supervise employees may give rise to 42 U.S.C. § 1983 county liability.  See Connick, 131 S. Ct. at 1359; Thompson v. Upshur Cty., 245 F.3d 447, 459 (5th Cir. 2001).  In such cases, a county may be held liable only when its actions amount to deliberate indifference to the constitutional rights of those citizens with whom the untrained or unsupervised employees come into contact.  Connick, 131 S. Ct. at 1359; Thompson, 245 F.3d at 459.  Courts repeatedly emphasize how very high the standard of proof is to impute liability in these cases.  See, e.g., Connick, 131 S. Ct. at 1360.

Typically, a plaintiff can prove deliberate indifference only through evidence of a pattern of violations caused by the lack of

training or supervision.  <u>Connick</u>, 131 S. Ct. at 1360; <u>Thompson</u>, 245 F.3d at 459.  The factfinder simply cannot infer a policy of authorizing officer misconduct from a single incident except "in a narrow range of circumstances where a constitutional violation would result as the highly predictable consequence of a particular failure to train."  <u>Kitchen</u>, 759 F.3d at 484 (internal quotation marks omitted)(quoting <u>Connick</u>, 131 S. Ct. at 1361); <u>see also</u> <u>Thompson</u>, 245 F.3d at 459.  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  <u>Connick</u>, 131 S. Ct. at 1360.

The court pauses to address the 2009 letter from the U.S. Department of Justice concerning an investigation into the conditions at the Harris County Jail.[226]  As previously explained, that letter is only relevant to the extent that it put Harris County on notice of a possible pattern of potentially unconstitutional acts at the time preceding the investigation. Although Plaintiffs point to this letter as evidence that HCSO training was inadequate and that implementation of Harris County's policies was negligent, they offer no evidence to connect the results of the investigation two years earlier with the practices

---

[226]    <u>See</u> Doc. 124-16, Sealed App. PP to Pls.' Opp'n to Harris Cty.'s Am. Mot., Letter from Loretta King to Judge Ed Emmett Dated June 4, 2009.

at the jail at the time of Hick's death.  There is an evidentiary gap with regard to what happened in the interim.  So, even if the letter proved a prior pattern of unconstitutional conduct, there is no evidence that those patterns continued into January 2011. Absent any evidence of an ongoing pattern of unconstitutional conduct, notice of past patterns is immaterial.

As Plaintiffs failed to provide evidence or arguments on the alleged failure to train on the use of deadly force, the treatment of mentally ill inmates,[227] or the general constitutional requirement to provide necessary medical treatment, the court does not discuss those.  Furthermore, the evidence supports a finding that all three officers met the minimum TCOLE training requirements, which covered using force and dealing with mentally ill inmates, among other topics.  Here, the court addresses Plaintiffs' arguments regarding the alleged failure to train on the responsibility to request medical treatment and to place and complete round sheets.

Plaintiffs' primary failure-to-train argument is that the officers involved in the use-of-force incident with Hicks were not adequately trained, evidenced by the fact that none of them requested medical treatment for Hicks after the incident. Plaintiffs argue Harris County's policy did not explicitly state

---

[227] Plaintiffs concede that officers were trained to alert the mental-health unit when they observed certain behaviors that suggested mental instability.  See id. p. 31.

how the officers should have determined whose responsibility it was to seek medical assistance, and the officers were not trained on how to make that determination.

This ipso facto argument is facially appealing in that it points to an omission in Harris County's policy on rendering medical aid to every inmate involved in a use-of-force incident. Certainly, Deputy Jameson, Officer Taylor, and Officer Pool each made a deadly assumption about who would effectuate Harris County's policy to request medical assistance. But these officers' failure to follow policy cannot be placed on the policymakers of Harris County. Plaintiffs fail to provide evidence that such poor judgment had ever occurred before, much less that it had resulted in constitutional harm. The application of single-incident liability also is not appropriate as constitutional harm is not a highly predictable consequence of the failure to render medical aid after a use-of-force incident. Use-of-force incidents may be minor and result in no injuries at all.

Plaintiffs provide no other evidence that Harris County was aware or should have been aware that, in a use-of-force incident involving multiple officers, all officers would assume another would take the required action of contacting the medical staff. In fact, four of the five reports in the record concerning use-of-force incidents involving Officer Pool also involved other officers. The inmate involved in each multiple-officer incident

60

received medical care.

Plaintiffs contend that the officers involved in the Hicks' incident were not trained on how to use round sheets.[228]   Their logic is identical to the prior one concerning medical treatment and fails for the same reasons.

Summary judgment should be granted in favor of Harris County on Plaintiffs' constitutional claims.

### IV.   Conclusion

Based on the foregoing, Harris County's nondispositive motions are **DENIED**, and the court **RECOMMENDS** that Harris County's dispositive motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13.   Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such

---

[228]   Plaintiffs put this brief argument under the category of failure to train its officers regarding the use of attorney booths, arguing that the officers were incorrectly taught that the placement of inmates in attorney booths was permissible.   See Doc. 123, Pls.' Opp'n to Harris Cty.'s Am. Mot. p. 37. They cannot prevail on a failure-to-train argument regarding the use of attorney booths as holding cells because Plaintiffs failed to plead and produce evidence of a violation of Hicks' constitutional rights based on that use.

objections shall be mailed to opposing parties and to the chambers
of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

    **SIGNED** in Houston, Texas, this 23rd day of November, 2015.

_____
U.S. MAGISTRATE JUDGE